# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### MIDDLE DIVISION

**MELVIN RAY,**
     Plaintiff,

**v.**

**JOHN HAMM,** *et al.*,
     Defendants.

**Case No. 4:24-cv-977-CLM**

## MEMORANDUM OPINION

Inmate Melvin Ray sues 14 employees of the Alabama Department of Corrections ("DOC"): Commissioner John Hamm; Classification Director Angie Baggett: Wardens Phillip Mitchell, Christopher Webster, and Darrel Fox; Correctional Lieutenants Monika Gadson, Roderick Gadson, Derrick Dent, and Brandon Burns; Correctional Sergeants Keller Speaks, Antonia Barnes, and JaJuan Howard; and Correctional Officers Randall Billingsley and Cholleé Jackson. Defendants ask the court to dismiss all counts. For the reasons explained below, the court **GRANTS IN PART AND DENIES IN PART** Defendants' motion (doc. 22).

## BACKGROUND

Because Ray is defending against a motion to dismiss, the court takes his pleaded facts as true. *Crowder v. Delta Air Lines, Inc.*, 963 F.3d 1197, 1202 (11th Cir. 2020)

### A. Advocacy

Ray is in state custody. Ray describes himself as a nonviolent advocate for inmates' rights. Ray and fellow inmate Robert Council co-founded the Free Alabama Movement ("FAM"), an organization dedicated to protesting civil and human rights violations committed by or within DOC. Ray claims his participation in FAM makes him a target for inhumane and cruel treatment by DOC employees.

1

Until his recent transfer to Limestone, Ray was housed at St. Clair Correctional Facility in Springville, Alabama. Beginning in February 2024, the Tennessee Student Solidarity Network ("TSSN"), an activist group focusing on the civil rights of prisoners, started regularly protesting outside of St. Clair in support of FAM and Ray.

**B. Restrictive Housing**

Ray claims that several Defendant abused him in retaliation for the TSSN protests. Ray provides these examples.

- **March 30, 2024**

TSSN protested an Alabama prison construction site in mid-March 2024. A week later, Billingsley and Russell approached Ray as he was praying in the "Spiritual Grounds" area outside of his H-Dorm cell in St. Clair. Billingsley and Russell searched Ray and his immediate surrounding area. Finding no contraband on his person, they detained Ray while Monika Gadson, Speaks, and Barnes searched his living area.

According to Ray, Gadson, Speaks, and Barnes broke his headphones, desecrated his religious items, and destroyed his property. The search of Ray's cell led to the discovery of a cell phone, which led to a strip-search of Ray by Billingsley and Barnes. Ray claims Billingsley planted the phone in his cell. Russell and Speaks subsequently detained a handcuffed Ray in a restricted housing unit ("the RHU cage") for nearly five hours.

Ray claims that "[p]lacement in the RHU cage [] restricts a prisoner's movement even more so than solitary confinement and deprives a prisoner of any privacy and or ability to use his personal property and is typically used to punish prisoners." (*Id.,* ¶ 52). The housing unit had no bathroom or running water. After Ray was cleared to leave the RHU cage, Seals advised him against filing a grievance.

- **April 1, 2024**

Two days later, Roderick Gadson and Howard told Ray about an

ongoing DOC Law Enforcement Services Divisions ("LESD") investigation on Ray that resulted in "lock-up orders." In response to Ray asking why LESD was investigating him, R. Gadson responded "I don't know . . . Just cuff up." (Doc. 21, ¶42). R. Gadson and Howard placed Ray in the RHU cage for several hours before moving him to solitary confinement. Ray remained in solitary confinement from April 1, 2024 until April 28, 2024.

Ray describes his solitary confinement cell as filthy and lacking running water and lighting. While in solitary, Ray was only permitted one shower per week and was denied access to basic cleaning supplies, exercise, and his pre-approved vegetarian meals. According to Ray, he carried out his solitary confinement in a racially segregated housing unit. On April 17, 2024, Ray's attorneys sent a cease-and-desist letter to St. Clair citing DOC's own 72-hour limit on holding prisoners in solitary confinement without pending disciplinary charges. The letter, addressed to St. Clair's Wardens, also pointed out that inmates caught with contraband are not usually subject to solitary confinement. Ray doesn't include the date St. Clair received the letter.

- **April 13, 2024, April 20, 2024, and May 2–3, 2024**

While Ray was in solitary confinement on April 13, 2024, TSSN held another protest at St. Clair. Dent, Fester, Allan, and Russell moved Ray from solitary to the RHU cage when the protest started where he remained handcuffed until the protest ended. The same thing happened on April 20, 2024: solitary confinement, TSSN protest starts, RHU cage, TSSN protest ends, back to solitary confinement.

Ray experienced similar treatment on May 2, 2024 and May 3, 2024. On May 2, 2024, Monika Gadson and Webster took Ray from his cell and seated him in a chair in "the breezeway" during a TSSN protest. And on May 3, 2024, Burns strip-searched Ray during a TSSN protest. "Several officers" then took and destroyed Ray's (non-contraband) property. (*Id.*, ¶59).

### C. Disciplinary Hearing

Ray received a disciplinary citation on April 3, 2024, for possessing the cellphone Billingsley found in Ray's cell. As evidence of possession, several St. Clair officers claimed Ray was alone in the location Billingsley found the phone, allegedly proving the phone must have belonged to Ray. In response, Ray listed three people (Leon Bond, Ricky Rankin, and Edmond Brown) that were praying with him in the Spiritual Grounds on April 30, 2024. Ray claims that Monika Gadson and Jackson threatened his named witnesses to steer clear of Ray's disciplinary proceedings.

Ray's disciplinary hearing was held on April 17, 2024, with Jackson serving as the disciplinary hearing officer. At the hearing, Jackson allegedly stated that Ray's witnesses couldn't be called because "Ray had failed to provide the complete first and last name of each witness and therefore correctional officers could not locate the three witnesses." (*Id.*, ¶ 65). Ray, of course, disputes Jackson's characterization and asserts he was denied the opportunity to present any witnesses or question any officer who testified against him. Ray also claims Monika Gadson lied during the hearing and that Jackson found him guilty of contraband possession as pretext for his continued housing in solitary confinement.

### D. Transfer

Ray was transferred without request from St. Clair to Limestone on May 30, 2024. According to Ray, he was transferred to quell the weekly TSSN protests at St. Clair. At the same time Ray moved from St. Clair to Limestone, ADOC transferred FAM co-founder Robert Council from Limestone to St. Clair. Though Ray and Council have been friends for years, ADOC insists on labeling them "enemies," thus prohibiting the two men from being housed in the same facility.

### E. Lawsuit

In his complaint, Ray pleads these nine claims:

| Count | Who | What | Why | Requested Relief |
|-------|-----|------|-----|------------------|
| I | Hamm, Baggett | First Amendment Retaliation | In their official capacities, Hamm and Baggett retaliated against Ray's speech by transferring him to Limestone and designating him as an enemy of Robert Council. | Injunction ordering transfer back to St. Clair and removal of enemy designation |
| II | Mitchell | First Amendment Retaliation | Mitchell violated Ray's First Amendment rights by, in his official capacity, subjecting Ray to a pattern or practice of abuse (*e.g.*, solitary confinement, placement in the cage, unwarranted searches, and so on). | Injunctive relief to prevent continued retaliation upon transfer back to St. Clair |
| III | Mitchell | Eighth Amendment Violation | Mitchell, in his official capacity, violated the Eighth Amendment by unjustly punishing Ray through handcuffing and placing him in the RHU cage. | Injunctive relief against use of the RHU cage as punishment when Ray returns to St. Clair |
| IV | Mitchell | Fourteenth Amendment, Violation | Mitchell, in his official capacity, violated Ray's Due Process rights by (unjustly and without process) holding him in the RHU cage to offend Ray's bodily autonomy. | Injunctive relief against use of the RHU cage as punishment when Ray returns to St. Clair |
| V | Webster, Fox, Mitchell, M. Gadson, Dent, Burns, Speaks, Barnes, R. Gadson, Howard, Billingsley, Jackson | First Amendment Retaliation | Ray experienced retaliation for his support of FAM and the TSSN protest from Defendants in their individual capacities by (1) placement in RHU cage, (2) harassing searches and property destruction, (3) solitary confinement without due process, and (4) unsanitary conditions within solitary confinement. | Damages |

| | | | | |
|---|---|---|---|---|
| VI | Webster, Fox, Mitchell, M. Gadson, Dent, Speaks, Barnes, R. Gadson, Howard | Eighth Amendment Violation | Defendants in their individual capacities violated the Eighth Amendment by unjustly punishing Ray through handcuffing and placing him in the RHU cage. | Damages |
| VII | Billingsley, M. Gadson, Jackson | Fourteenth Amendment, Violation | Without a meaningful opportunity to contest detainment, Defendants kept Ray in solitary confinement and lied during his disciplinary hearing. | Damages |
| VIII | Webster, Fox, Mitchell, M. Gadson, Dent, Speaks, Barnes, R. Gadson, Howard | IIED | Defendants violated Alabama law through the extreme and outrageous repeated use of the RHU cage. | Damages |
| IX | M. Gadson, Speak, Barnes, Dent, Burns | Conversion | Defendants violated Alabama law by maliciously destroying Ray's property. | Damages |

Defendants ask the court to dismiss all claims.

## STANDARD

Because this is a Rule 12 motion, the court accepts the allegations in Ray's complaint as true and construes them in the light most favorable to Ray. *Lanfear v. Home Depot, Inc.*, 697 F.3d 1267, 1275 (11th Cir. 2012). The ultimate question is whether all of Ray's allegations, when accepted as true, "plausibly give rise to an entitlement of relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). If the facts as pleaded could entitle Ray to relief, then the court must deny Defendants' motion to dismiss. If, however, the court accepts all of Ray's pleaded facts as true, and Ray still would not be entitled to relief, then the court must grant the motion.

## DISCUSSION

Before it can reach the merits, the court must deal with two ancillary issues: fictitious party pleading and Ray's requested relief. The first is easily dispatched: Fictitious party practice is generally not allowed in federal court, *see* Fed. R. Civ. P. 10(a); *Richardson v. Johnson*, 598 F.3d 734, 738 (11th Cir. 2010), so the court dismisses all claims against the two fictitious Defendants, "LESD Agent John Doe 1" and "Desk Clerk Jane Doe 2." (Doc. 21, pp. 1, 20, 24, 29). The relief-related issues, however, warrant their own discussion section.

### A.

### Relief-related Issues

#### 1. Needs-Narrowness-Intrusiveness Test (Counts I-IV)

In his prayer for relief, Ray asks the court to:

- Order Defendants to transfer him back to St. Clair;

- Order Defendants not to designate Ray and Council as enemies;

- Order Defendants not place Ray in solitary confinement when protestors are outside his facility;

- Order Defendants not to search Ray's body or possessions when protestors are outside his facility;

- Order Defendants not to desecrate Ray's religious materials when protestors are outside his facility; and,

- Order Defendants not to file disciplinary charges against Ray without due process when protestors are outside his facility.

(Doc. 21, p. 35). Defendants argue that the court must dismiss Counts I-IV because these requests violate the needs-narrowness-intrusiveness test of the Prison Litigation Reform Act. (Doc. 23, p. 10).

While Defendants may ultimately be right about the PLRA, the court cannot dismiss Counts I-IV on this ground (at least not yet). Rule 8 doesn't require Ray to plausibly allege a *form* of relief; it only requires Ray to plausibly allege *facts* that could state a claim for relief. As the Eleventh Circuit recently explained,

> [r]equesting an improper remedy is not fatal to a claim. A complaint is sufficient if it alleges facts that establish that the plaintiff is entitled to any relief that the court can grant. That a plaintiff might misconceive his remedy does not warrant dismissal of the complaint unless he is entitled to no relief under any state of facts. . . . Although these precedents pre-date *Bell Atlantic Corp. v. Twombly*, that decision did not disturb the rule that requesting an improper remedy is not fatal to a claim. *Twombly* replaced the "no set of facts" standard with the requirement that complaints must state "plausible" claims. But *Twombly* did not change the rule that a district court must consider whether a complaint that seeks an improper remedy might warrant another form of relief.

*A.W. by and Through J.W. v. Coweta County Sch. District*, 110 F.4th 1309, 1315 (11th Cir. 2024) (internal citations and quotations omitted). Here, Ray requests damages in addition to injunctive relief, (doc. 21, p. 35–36), and there will be plenty of time for remedy arguments if this case proceeds. So for now, the court does not find that the needs-narrowness-intrusiveness test warrants dismissal of any count.

### 2. Injunctive Relief Claims Against Mitchell (Counts II-IV)

Ray's requested relief, however, does warrant dismissal of his claims against Mitchell (*i.e.*, Counts II-IV). In each of these counts, Ray sues Mitchell only in his official capacity as St. Clair's warden. *See* (doc. 21, ¶¶ 89, 104, 109).

In Count I, Ray alleges that he was wrongly moved from St. Clair to Limestone and asks the court to order he be sent back to St. Clair. Counts II-IV assume Ray's success on Count I, meaning that Ray's claims depend on him being sent back to St. Clair. Specifically, Ray asks the court to order Mitchell, in his official capacity as St. Clair's warden, to ensure that Ray doesn't suffer further retaliation after his return to St. Clair. (Doc. 21, p. 16–20).

Defendants argue Counts II–IV are moot because Ray is not housed at St. Clair. (Doc. 23, p. 13–14). The court agrees. As pleaded, Ray is not an inmate at St. Clair and there's no imminent plan for him to return to St. Clair absent a court order. Even if Ray does return to St. Clair, there is no guarantee Mitchell will still be warden or that retaliation is a continued risk. Accordingly, Counts II–IV do not present a live controversy over which the court has jurisdiction. *See Soliman v. U.S. ex rel. INS.*, 296 F.3d 1237, 1242 (11th Cir. 2002). And for the same reasons, the "capable of repetition yet evading review" exception to mootness doesn't apply. *Id.* ("[T]he exception can be invoked only when [] there [is] a reasonable expectation or a demonstrated probability that the *same* controversy will recur involving the *same* complaining party . . ."). The court will therefore dismiss Counts II–IV for lack of subject matter jurisdiction.

## B.

## Federal claims

That leaves the court with Counts I and V-IX. The court starts with Ray's federal claims to determine whether Ray pleads any claims that invoke the court's original jurisdiction. And within those claims, the court starts with Ray's claim that seeks prospective injunctive relief because qualified immunity does not apply.

### <u>Count I</u>: First Amendment Retaliation (injunctive relief)

1. *Allegation*: In his first count, Ray pleads that certain Defendants transferred him from St. Clair to Limestone in retaliation for Ray

exercising his First Amendment rights. Among other things, Ray alleges that he and Council co-founded FAM to challenge inmates' conditions of confinement. To chill their speech, Ray alleges that Defendants wrongly tagged him and Council as "enemies" so that they would have to be housed in different facilities, thus requiring Ray be transferred out of St. Clair when Council transferred in on the same day. As relief, Ray asks the court order Hamm and Baggett remove the "enemy" label and transfer Ray back to St. Clair.

2. *Analysis*: The court finds that Ray sufficiently pleads a retaliation claim. "To state a §1983 First Amendment retaliation claim, a plaintiff generally must show: (1) []he engaged in constitutionally protected speech, []; (2) the defendant's retaliatory conduct adversely affected that protected speech and right to petition; and (3) a causal connection exists between the defendant's retaliatory conduct and the adverse effect on the plaintiff's speech and right to petition." *DeMartini v. Town of Gulf Strean*, 942 F.3d 1277, 1289 (11th Cir. 2019). If he proves his alleged facts, Ray could show that (a) he and Council engaged in constitutionally protected speech and association (b) Defendants' acts that separated the two men would likely deter others from exercising their First Amendment rights, and (c) Defendants took those actions because Ray was exercising his rights. *See Turner v. Williams*, 65 F.4th 564, 580 (11th Cir. 2023) ("A plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights."). So the court denies Defendants' motion to dismiss Count I.

## Count V: First Amendment Retaliation (money damages)

In Count V, Ray alleges multiple acts of retaliation on different days involving different defendants. So the court breaks down the allegations by event type and date to determine whether any result in a viable claim.

1. **Holding Cage allegations**

1. *Sufficiently pleaded:* According to Ray, St. Clair's restricted housing unit (RHU) walk yard has a holding cell that Ray describes as a "small, metal, confined cage with no running water or bathroom." (Doc. 21, ¶ 39). Ray alleges that some combination of Defendants placed him in an RHU cage or otherwise mistreated him during and/or in retaliation for TSSN protests outside St. Clair on these dates:

- *March 30, 2024*: Ray alleges that when TSSN protestors arrived at about 12:15pm, five Defendants (Monika Gadson, Speaks, Barnes, Billingsley, and Russell) locked him in an RHU cage for five hours. These defendants released Ray from the cage as soon as the protest ended.

- *April 13, 2024*: Ray alleges that when TSSN protestors arrived at about 12:15pm, four Defendants (Dent, Hester, Allen, and Russell) took him from his cell and locked him in an RHU cage for three hours. These defendants released Ray from the cage as soon as the protest ended.

- *April 20, 2024*: Ray alleges that when TSSN protestors arrived at about 12:00pm, multiple unnamed officers took him from his cell and locked him in an RHU cage for one hour. These defendants released Ray from the cage as soon as the protest ended.

- *May 3, 2024*: Ray alleges that immediately after a TSSN protest ended, 8 to 10 officers removed him from his cell, destroyed his property, and strip searched him. Ray does not allege he was put in an RHU cage.

The court finds that Ray sufficiently pleads a retaliation claim for each of these incidents.

11

Assuming Ray's facts are true, and reading them in a light most favorable to Ray, Ray could show that (a) Ray and TSSN were associated for protected expressive purposes, (b) Defendants' use of the RHU cage and/or destruction of property would dissuade others from associating to express similar ideas or grievances, and (c) Defendants took these acts because of Ray's association with TSSN and TSSN's expression of ideas and grievances. Whether Ray can ultimately prove facts that satisfy these elements is a question for another day. *See, e.g.*, *Roberts v. U.S. Jaycees*, 486 U.S. 609, 622-23 (1984) ("According protection to collective effort on behalf of shared goals is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority. Consequently, we have long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends. . . . The right to associate for expressive purposes is not, however, absolute. Infringements on that right may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms.") (citations omitted).

2. *Deficient pleading*: Some of Ray's other fact allegations, however, do not lead to viable claims. The court finds that Ray's allegation that Roderick Gadson and Howard placed him in an RHU cage on April 1, 2024 (¶ 55) does not—by itself—plead a viable claim because Ray fails to plead any facts linking that placement to TSSN or any other protected activity. The court also finds that Ray's allegation that Monika Gadson and Webster moved him to a chair in the breezeway on May 2, 2024 (¶ 58) does not plead a viable claim because the threat of being moved from a cell to a breezeway chair would not dissuade others from engaging in protected activity.

3. *Qualified immunity*: Because Ray seeks money damages, finding that Ray pleaded a viable claim(s) does not end the analysis. Qualified immunity protects government officials from being sued in their

individual capacities so long as "their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Vineyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate. [] To overcome a qualified immunity defense, the plaintiff must make two showings. First, the plaintiff must establish that the defendant violated a constitutional right. Second, the plaintiff must show that the violation was clearly established." *Foulke v. Weller*, 2024 WL 2761778, at *5 (May 29, 2024, 11th Cir.).

Each act Ray complains about (*e.g.*, placement in an RHU cage, cell searches) falls within Defendants' discretionary authority as prison officials. So Ray has the burden to plead facts that would show (1) a constitutional violation and (2) the violative act violated Ray's clearly established rights. The court has found that Ray pleads facts that would show a constitutional violation. The court now finds that when Defendants allegedly began retaliating against Ray in March 2024, it was clearly established that prison officials cannot retaliate against an inmate because that inmate, or a person or group with whom the inmate is associated for expressive purposes, complained about prison conditions.

"The First Amendment forbids prison officials from retaliating against prisoners for exercising the right of free speech." *Farrow v. W.*, 320 F.3d 1235, 1248 (11th Cir. 2003). Freedom of association is similarly protected under the First Amendment. *Roberts*, 467 U.S. at 618 ("The Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion."). "It is an established principle of constitutional law that an inmate is considered to be exercising his First Amendment right of freedom of speech when he complains to the prison's administrators about the conditions of his confinement. It is also established that an inmate may maintain a cause of action against prison administrators who retaliate against him for making such complaints." *Smith,* 532 F.3d at 1276.

If Ray can prove that prison officials locked him in a cage for hours and/or destroyed his personal belongings because a political action group was outside chanting protests against prison conditions and in favor of Ray personally, *see* (doc. 21, ¶¶ 26-29), then Ray could show that Defendants violated a clearly established right. The court recognizes that "freedom of association is among the rights least compatible with incarceration." *See Overton v. Bazzetta*, 539 U.S. 126, 131 (2003). But accepting Ray's pleaded facts as true, Defendants' actions bear no "rational relation to legitimate penological interests." *See id.* at 132. Defendants instead took adverse action against Ray solely because a group he was associated with was protesting prison conditions just outside St. Clair's walls. So the court denies qualified immunity to Monika Gadson, Speaks, Barnes, Billingsley, Dent, Hester, Allen, and Russell at this time.

4. *Supervisory Liability*: Finally, the court must decide whether Ray pleads facts that would attach supervisory liability to Wardens Webster and Fox. "Supervisor liability under §1983 occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation. The causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so." *Braddy v. Florida Dept. of Labor and Employment Sec.*, 133 F.3d 797, 802 (11th Cir. 1998) (quoting *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990)).

The court finds that Ray has not plausibly alleged facts that show Fox personally participated in a constitutional violation or sanctioned the allegedly unlawful acts of his subordinates. Nor has Ray articulated the existence of a widespread pattern and history of abuse within St. Clair that would put Fox on notice. (Doc. 23, p. 24–26). All Ray claims is that the Fox "must have known" of Ray's abuse, which is insufficient to meet the pleading standard. (Doc, 21, ¶124). So Ray has failed to state any supervisory liability claim against Fox.

The court reaches the same result for Webster but for a different reason. Ray pleads that on May 2, 2024, Webster personally participated in the moving of Ray from his cell to "sit in a chair in the breezeway for multiple hours" while TSSN protested outside. (Doc. 21, ¶58). As stated, the court finds that having Ray sit in a chair rather than in his cell is not an adverse action because knowledge of this act would not dissuade another inmate from associating with FAM or TSSN or speaking out against prison conditions.

### 2.  Searches with property destruction

According to Ray, certain Defendants also performed unreasonable searches and destroyed his personal property during and/or in retaliation for TSSN protests outside St. Clair on these dates:

- *March 30, 2024*: Monika Gadson led a search of Ray's personal items that resulted in the desecration of his religious items, the destruction of his headphones, and the strewing of his other property on the ground. Speaks and Barnes also participated.

- *April 13, 2024*: Dent led a search that resulted in the desecration of other religious artifacts.

- *May 3, 2024*: Burns led a strip search that included the destruction and taking of Ray's personal goods, religious items, and state-issued tablet.

As explained, each of these searches occurred during or just after a TSSN protest. So the court finds that Ray pleads a viable retaliation claim for these incidents for the same reason the court found Ray's 'RHU cage' claims were viable—*i.e.*, Ray could prove that Defendants took an adverse action against Ray because of his protected association with TSSN, who was engaged in protected speech.

The court similarly finds that neither Monika Gadson, Dent, nor Burns is entitled to qualified immunity for the reasons explained in the court's RHU cage analysis. While each Defendant was acting in his or her

official capacity, each alleged act (if proved) would violate a constitutional right that was clearly established at the time.

### 3. Solitary confinement with harsh conditions

According to Ray, multiple Defendants conspired to place and keep him in solitary confinement cell C35 from April 1, 2024 through April 28, 2024 in retaliation for the TSSN protests:

- On April 1, an unnamed LESD agent ordered Ray into solitary confinement;

- Within solitary confinement, Monika Gadson and Howard put Ray in cell C35 because they knew it was flooded, covered in filth, and lacked light and running water;

- Billingsley, Gadson, and Jackson fabricated a disciplinary charge to make sure Ray stayed in solitary confinement, then at the disciplinary hearing:

  o Billingsley lied about finding a contraband cell phone;

  o Gadson blocked Ray from calling witnesses; and,

  o Jackson, as presiding officer, found Ray liable without hearing from Ray's witnesses; and,

- After ensuring Ray's loss at the hearing, Gadson and Howard failed to move Ray from cell C35 or provide Ray with cleaning supplies to make C35 more livable.

(Doc. 21, ¶¶ 139-48). Assuming these facts are true and that Ray can tie them to the TSSN protests as he claims, the court finds that Ray pleads a viable retaliation claim for the same reason the court found Ray's RHU cage and property destruction claims were viable—*i.e.*, Ray could prove that Defendants took an adverse action against Ray because of his

protected association with TSSN, who was engaged in protected speech.[1]

The court similarly finds that neither Billingsley, Monika Gadson, nor Jackson is entitled to qualified immunity for the reasons explained in the court's RHU cage analysis. While each Defendant was acting in his or her official capacity, each alleged act (if proved) would violate a constitutional right that was clearly established at the time.

—

To sum up Count V, the court finds that Ray sufficiently pleaded a retaliation claim(s) against Monika Gadson, Allen, Speaks, Barnes, Burns, Billingsley, Dent, Hester, Jackson, and Russell. The court further finds that none of these Defendants is entitled to qualified immunity at this point. The court will dismiss, however, Ray's retaliation claims against Roderick Gadson, Fox, Webster, and Howard for failure to state a claim that can entitle Ray to relief. *See* Fed. R. Civ. P. 12(b)(6).

## Count VI: Cruel & Unusual Punishment (money damages)

As recounted in Count V part 1, Ray alleges that certain Defendants put him in an RHU cage from one to five hours during or just after TSSN protests. In Count VI, Ray alleges that each placement in the RHU cage amounts to deliberate indifference in violation of the Eighth Amendment's prohibition against cruel and unusual punishment.

"[A] prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation alleged must be, objectively, 'sufficiently serious,' and . . . [second], the prison official must have a 'sufficiently culpable state of mind.'" *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal citations omitted). Recently, the en banc Eleventh Circuit expounded on this test. *See Wade v. McDade*, 106 F.4th 1251 (11th Cir. 2024). Under *Wade*, to prevail on an Eight Amendment deliberate indifference claim, the inmate must prove three things: (1) "that the

---

[1] At some point, Ray will have to explain certain things, such as, if Ray's placement in cell C35 was retaliatory punishment for TSSN's protests, then why did Defendants remove Ray from C35 and place him in an RHU cage during TSSN's April 13 protest, then return him to C35 when TSSN left? But for now, Ray is allowed to plead alternative theories of adverse action.

official was subjectively aware that the inmate was at risk of serious harm, (2) "the official disregarded that risk," and (3) "the official acted with more than some requisite level of negligence." *Id.* at 1255. *Wade* dealt with the third factor and resulted in a decision that the requisite level of culpability is ***much*** higher than mere negligence:

> a deliberate-indifference plaintiff must prove that the defendant acted with 'subjective recklessness as used in the criminal law,' and that in order to do so, the plaintiff must show that the defendant was subjectively aware that his own conduct put the plaintiff at substantial risk of serious harm—with the caveat that, in any event, a defendant who "respond[s] reasonably' to a risk, even a known risk, 'cannot be found liable' under the Eighth Amendment[.]

*Id.* (citations omitted).

Ray fails to plead any facts that would show he was at risk of serious harm while inside the RHU cage, much less any facts that would prove any Defendant knew that such a risk existed *and* acted with a subjective, criminal-level recklessness when putting Ray in the RHU cage any way. So Ray fails to state a claim that could entitle him to relief on Count VI. *See* Fed. R. Civ. P. 12(b)(6). Further, because Ray fails to plead that any official violated his Eighth Amendment rights, Ray necessarily fails to plead supervisory liability against any Defendant. *See Mann v. Taser Intern., Inc.*, 588 F.3d 1291, 1309 (11th Cir. 2009). So the court will dismiss Count VI without prejudice.

## <u>Count VII</u>: Procedural Due Process (money damages)

As recounted in Count V part 3, Ray alleges that Billingsley, Jackson, Monika Gadson, and an unnamed LESD agent conspired to place and keep Ray in an unsanitary solitary confinement cell (C35) for nearly a month. In Count VII, Ray alleges these acts also violated his procedural due process rights under the Fourteenth Amendment.

To ultimately prove this claim, Ray must prove three things: "(1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir.2003) (citing *Cryder v. Oxendine*, 24 F.3d 175, 177 (11th Cir.1994)). "Lawful imprisonment necessarily makes unavailable many rights and privileges of the ordinary citizen . . . [But prisoners] may not be deprived of life, liberty, or property without due process of law." *Wolff v. McDonnell*, 418 U.S. 539, 555–56 (1974).

That said, the Fourteenth Amendment does not create property interests. *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). Property interests are instead "defined by existing rules or understandings that stem from an independent source such as state law." *Id.* The Supreme Court held that "[s]tates may under certain circumstances create liberty interests which are protected by the Due Process Clause. But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484–85 (1995). With that backdrop, the court assesses Ray's two theories of Fourteenth Amendment liability.

### 1. Solitary Confinement

Ray first complains about placement in a solitary confinement cell, rather than general population. But Ray points to no Alabama statute, ADOC policy, or precedent that creates a right to be housed in general population. That said, the Supreme Court forged a second path for inmates to find liberty interests in *Sandin*. "After *Sandin,* it is clear that the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions but the nature of those conditions themselves in relation to the ordinary incidents of prison life." *Wilkinson v. Austin*, 545 U.S. 209, 223 (2005). Ray could thus plausibly state a liberty interest by showing that his time in cell C35 presented an "atypical, significant deprivation in which a State might

conceivably create a liberty interest." *Sandin*, 515 U.S. at 486.

In creating this "atypical deprivation" path, however, the *Sandin* Court refused to find a state-created liberty interest against segregated housing because the

> record show[ed] that, at the time of Conner's punishment, disciplinary segregation, with insignificant exceptions, mirrored those conditions imposed upon inmates in administrative segregation and protective custody. . . . Thus, Conner's confinement did not exceed similar, but totally discretionary, confinement in either duration or degree of restriction. Indeed, the conditions at Halawa involve significant amounts of 'lockdown time' even for inmates in the general population. Based on a comparison between inmates inside and outside disciplinary segregation, the State's actions in placing him there for 30 days did not work a major disruption in his environment. Nor does Conner's situation present a case where the State's action will inevitably affect the duration of his sentence."

*Id.* 486–87.

Ray's pleaded facts largely mirror the facts the *Sandin* Court rejected. While Ray alleges the C35 cell presented difficult (if not abhorrent) conditions, he does not allege facts showing such conditions were atypical, abnormal, or severe compared to the housing conditions of general population or other solitary cells. Ray also doesn't allege that the reasons, frequency, or duration for which he stayed in the solitary confinement unit were atypical of St. Clair's normal practice. Nor does Ray allege that his tenure in solitary confinement was for an indefinite duration, impacted the length of his sentence, or affected any chance of early release. And Ray pleads facts that would show other inmates were housed in the same unit, meaning that his confinement was not wholly "solitary." *See, e.g.* (doc. 21, ¶¶ 46, 56). So the court finds that Ray fails to plead facts that would establish that Ray had a protected interest in being kept in general population, rather than the C35 solitary confinement cell.

*See* Fed. R. Civ. P. 12(b)(6).

### 2. Disciplinary Hearing

Ray next pleads that the disciplinary hearing that resulted in his solitary confinement was a sham tainted by false testimony against him and the preclusion of witnesses for him. While Ray may have pleaded facts that would establish inadequate process, Ray still fails to plead a protected liberty interest. According to Ray, the outcome of the disciplinary hearing was continued time in solitary confinement. (Doc. 21, ¶¶ 69, 166). As explained, Ray has not plausibly alleged a liberty interest in remaining in general population, rather than solitary confinement. So even if Ray can prove his hearing was inadequate, he cannot prove that inadequacy deprived him of a protected interest.

—

To sum up Count VII, Ray fails to plead facts that would establish the loss of a protected interest. So Ray fails to plead a viable claim against the participating officers (Monika Gadson, Jackson, and Billingsley) and necessarily against their supervisors under a supervisory liability theory. *See Mann*, 588 F.3d at 1309. So the court will dismiss Count VII without prejudice.

### C.

### State-law claims

Because the court finds that Ray has pleaded at least one viable claim under federal law, the court moves on to Ray's state-law claims.

### <u>Count VIII</u>: Intentional Infliction of Emotion Distress

Ray alleges certain Defendants intentionally caused him emotional distress each time they put him in the RHU cage. Under Alabama law, the tort of intentional infliction of emotional distress and the tort of outrage mean the same thing. *Ex parte Lumbermen's Underwriting Alliance*, 662 So. 2d 1133, 1134 (Ala. 1995). To state a claim under either, Ray must prove a Defendant's conduct: "(1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so

severe that no reasonable person could be expected to endure it." *Harrelson v. R.J.*, 882 So. 2d 317, 322 (Ala. 2003) (quoting *Thomas v. BSE Indus. Contractors, Inc.*, 624 So. 2d 1041, 1043 (Ala. 1993)).

Alabama courts mean it when they say "extreme" and "so severe;" to state a claim, the alleged conduct must "go beyond all possible bounds of decency" and must "be regarded as atrocious and utterly intolerable in a civilized society." *Id.* at 322. As a result, the IIED tort is "extremely limited," and the Alabama Supreme Court has "recognized it in regard to only three kinds of conduct: (1) wrongful conduct in the family-burial context; (2) barbaric methods employed to coerce an insurance settlement; and (3) egregious sexual harassment." *Potts v. Hayes*, 771 So. 2d 462, 465 (Ala. 2000) (internal citations omitted). Although the Alabama Supreme Court recognized that a viable claim could fall outside these three categories, *id.*, both that state court and the Eleventh Circuit have been extremely reluctant to extend the tort to other categories of conduct. *See, e.g.*, *Stancombe v. New Process Steel LP*, 652 F. App'x 729, 739 (11th Cir. 2016); *McIsaac v. WZEW-FM Corp.*, 495 So. 2d 649, 651 (Ala. 1986).

Ray's confinement in an RHU cage does not fall into any one of the three recognized IIED categories. For federalism reasons, this court will not create a fourth category here. Federalism aside, the court further finds that Ray's placement in an RHU cell is not so extreme or severe as to "go beyond all possible bounds of decency," nor would it "be regarded as atrocious and utterly intolerable in a civilized society." *Harrelson*, 882 So. 2d at 322. So the court will dismiss Count VIII without prejudice.

## **Count IX**: Conversion

Finally, Ray claims conversion against Monika Gadson, Speaks, Barnes, Dent, and Burns. According to Ray, these Defendants violated Section 6-5-260 of the Alabama Code when they unlawfully destroyed his property during body and cell searches. (*Id.*). That statute provides:

> The owner of personalty is entitled to possession thereof. Any unlawful deprivation of or interference with such possession is a tort for which an action lies.

Ala. Code § 6-5-260.

1. *Sufficient pleading:* "To prove conversion, [Ray] must present evidence of a wrongful taking or a wrongful detention or interference, or an illegal assumption of ownership, or an illegal use or misuse." *Ex parte Anderson*, 867 So.2d 1125, 1129 (Ala. 2003) (internal quotation omitted). Showing "either title or possession is sufficient [for Ray to] maintain a conversion action." *Id.* According to Ray, he can prove conversion on these dates:

- On March 30, 2024, M. Gadson, Speaks, and Barnes searched Ray's cell, "desecrated Plaintiff Ray's sacred religious items, broke his headphones, and otherwise threw his property all over the ground," (doc. 21, ¶194),

- On April 13, 2024, Dent searched Ray's "person and property and desecrated his religious items," (*id.*, ¶197), and

- On May 3, 2024, Burns "destroyed or threw Plaintiff Ray's property and religious items all over the floor. Lt. Burns removed several items from Plaintiff Ray's property, including a state-issued "J Pay tablet," without returning Plaintiff Ray's property." (*id.*, ¶198).

Assuming these facts are true, Ray has sufficiently pleaded conversion of property on all three dates because, regardless of ownership, Ray has pleaded that the headphones, tablet, and religious items were all within his possession when Defendants destroyed or took them.

2. *State-agent immunity*: That said, Alabama state officials sued in their personal capacities for actions taken on behalf of the state are immune against claims for actions done when exercising judgement in the administration of a department or agency. *See* Ala. Code § 36-1-12; *Ex parte Butts*, 775 So.2d 173 (Ala. 2000). But immunity will not protect state officials that either (a) violate the United States Constitution or (b) act

"willfully, maliciously, fraudulently, [or] in bad faith." *See* Ala. Code § 36-1-12(d). Ray has pleaded facts that could establish one or both of these exceptions. As explained, Ray pleads facts that would establish that the searches occurred as part of an unconstitutional retaliation against Ray's first amendment rights. Further, citing the second exception, Ray pleads that each Defendant acted "willfully, maliciously, fraudulently, or in bad faith." (Doc. 21, ¶ 199). So the court cannot grant Defendants state-agent immunity at the pleading stage. The court will therefore deny Defendants' motion to dismiss Count IX.

**CONCLUSION**

For these reasons, the court **GRANTS** Defendants' motion to dismiss the following claims, without prejudice:

- Count II;
- Count III;
- Count IV;
- Count V, limited to claims against Roderick Gadson, Fox, Webster, and Howard;
- Count VI;
- Count VII; and,
- Count VIII against Webster, Fox, Mitchell, M. and R. Gadson, Dent, Speaks, Barnes, and Howard.

The court **DENIES** Defendants' motion to dismiss Counts I, V (against all Defendants not named above), and IX.

The court gives Ray one chance to amend his complaint if he wishes. Ray must file his amended complaint by **October 17, 2025**.

**DONE** and **ORDERED** on September 26, 2025.

_____

**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE